UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| IN RE: JERRY EDWARDS<br>  *DEBTOR* | CASE NO: 22-30950<br><br>CHAPTER 13 |
| | |
| JERRY EDWARDS<br>  *PLAINTIFF*<br>  *V.* | ADVERSARY PROCEEDING NO:<br><br>NO. _____ |
| NEWREZ LLC DBA SHELLPOINT<br>MORTGAGE SERVICING<br>  *DEFENDANT* | |

COMPLAINT

1. Plaintiff Jerry Edwards files this complaint seeking damages arising from Defendant, the mortgage servicer Newrez LLC dba Shellpoint Mortgage Servicing, for a willful violation of the plan and order confirming the plan under 11 U.S.C. 1327 and conversion.

2. On July 8, 2024, Hurricane Beryl blasted through the Houston area.  A massive tree in the yard of Plaintiff Jerry Edwards fell onto his home.  While his home insurance acted promptly to get funds to Mr. Edwards so that he could remove the tree and repair the damage to his roof, Defendant Newrez LLC dba Shellpoint Mortgage Servicing (hereinafter "Shellpoint") has refused to release the funds.

3. Mr. Edwards signed both checks from the insurance and mailed them to Shellpoint.  However, Shellpoint has refused to provide these funds

to Mr. Edwards for his repairs.  Mr. Edwards has tried valiantly to prevent further damage with the use of tarps but plastic is no substitute for a roof repair, and his home is open to moisture, insects, rodents and fungal spores.

4.  Shellpoint has provided numerous reasons for their failure to turn over the insurance funds so that repairs can be done.  Their final one was that because Mr. Edwards was late on the mortgage, an inspection was necessary.  Mr. Edwards is not late, but even if he was, Shellpoint has done an inspection months ago.

### A.    INTRODUCTION

2.  This is an action for actual and punitive damages, including attorney's fees, filed by the plaintiff for the failure of the defendant to comply with 11 U.S.C. §362 and 11 U.S.C. §1327.

3.  In addition, or in the alternative, this action is filed for actual damages, filed by the plaintiff for the defendant's conversion of insurance funds earmarked for home repair.

4.  This action is also filed to prevent the frustration of the underlying purposes of the United States Bankruptcy Code.  To date, debtor's counsel has been unable, despite repeated communication attempts through Defendant's counsel, to have the home insurance funds released to Debtor so that he can repair the home he is paying off in the bankruptcy.

### B. JURISDICTION AND STANDING

5.  This adversary proceeding relates to the Chapter 13 case of Plaintiff, *In re Jerry Edwards*, Case Number 22-30950, filed in the United States

Bankruptcy Court for the Southern District of Texas, Houston Division.

6. This Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §1334 and § 157(b) and (c).

7. To the extent the Court may find this to be a non-core proceeding, the plaintiff consents to the entry of a final order in this matter by the Bankruptcy Court, in accordance with 28 U.S.C. § 157(c)(2).

8. This Court has supplemental jurisdiction to hear all state law claims pursuant to 28 U.S.C. § 1367.

9. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to Plaintiff's claim occurred in this district. Defendants regularly transact business in this district.

10. Plaintiff has standing to bring this action as he has been and continues to be damaged economically and suffered damages to his home because of the defendants' willful violation of the automatic stay and conversion.

C. PARTIES

11. Plaintiff is the debtor in the above-captioned bankruptcy case, filed under Chapter 13 of the United States Bankruptcy Code.

12. Defendant NewRez LLC dba Shellpoint Mortgage Servicing ("Shellpoint") is a mortgage company with its principal office in Pennsylvania.  Shellpoint can be served through service on its registered agent Corporation Service Company d/b/a CSC-Lawyers Incorporation Service Company; 211 E. 7th Street, Suite 620; Austin, Texas 78701.

//

### D.  RELEVANT FACTS

13. Jerry Edwards purchased his partially constructed home on April 16, 2002 for $43,290.00.  It was Jim Walter "shell home", and Mr. Edwards was responsible for much of the interior construction himself.

14. Mr. Edwards had land to put the home on at what is now 309 W. Humble Street, Baytown, Texas.

15. Mr. Edwards initially financed his home with the seller, Jim Walter Homes.  He put $5,190 down on the cash price of $43,290 and financed the remaining $38,100 at an APR of 11.50%.  His payments without insurance were $387.20.

16. Like most contracts, there was no fee for paying the loan off early.  The fee for late payments was $5.00.

17. Rather uniquely, Jim Walter Homes, Inc had a contractual mechanic's lien on the partially constructed home it provided Mr. Edwards, on Mr. Edwards' land, and on the improvements provided after the sale by Mr. Edwards.  This was a purchase money security interest although the amount was not for the cash price.  Instead, the lien was for the amount of the 300 payments at 11.50% interest -- $116,160.00.

18. Upon completion of the shell home, Jim Walter Homes assigned Mr. Edwards' loan to Mid-State Homes, Inc.

19. Mid State Trust XI is still the owner of the loan.

20. U.S.Bank, N.A. is the trustee for Mid State Trust XI.

21. Mr. Edwards had made his home payments for almost twenty years without incident.  He was occasionally late but would catch up and pay the $5 late payments at that time as well.

22.  For years he kept up the insurance and property taxes as well, but at some point the property taxes were not paid.  He applied for and in October 2021 received a Disability Homestead Exemption and a tax deferral exemption.

23. NewRez dba Shellpoint Mortgage Servicing became the servicer in or around March 6, 2020.

24. For reasons that are unclear, Shellpoint began charging late fees of $19.36 monthly instead of the contractual rate of $5.00.

25. In November of 2020, Shellpoint paid $33,127.95 of taxes out of escrow to Goose Creek CISD and Harris County, making Mr. Edwards escrow $38,171.38 in the negative.  Mr. Edwards did not give Shellpoint permission to advance these funds.

26. On or around February 2021, Shellpoint then raised the monthly payment amount to $1,087.96.

27. Mr. Edwards was living on social security with occasional odd jobs – he had no way to pay this high of a payment.  He had budgeted only for the $387 payment he had been making for 19 years.

28. Shellpoint referred the property to an attorney to begin foreclosure proceedings on or around July 12, 2021.

29. To prevent the loss of his home of 20 years, the home he had over half built with his own labor, Mr. Edwards filed Chapter 13 bankruptcy on April 8, 2022.

30. The original loan of $38,100.00 had been paid down, after 20 years, to $21,707.58.  However, after an adjustment was made by Shellpoint where they added the escrow negative balance to the principal, and then added the foreclosure expenses in, the new "principal" became

$65,588.76.

31. Shellpoint's claim in Mr. Edwards' bankruptcy was for $65,056.52.

32. To avoid losing his home, and in accordance with Local Rule 3015-1(b), Mr. Edwards bankruptcy plan had him pay his mortgage through the plan, at 5.25% interest, in payments made by the trustee in the amount of $1,235.15 per month.

33. For the past three years, Mr. Edwards has not been late with his bankruptcy plan payments.  This is despite his social security payments being barely higher than his plan payment.

34. As required by Local Rule 3021-1(a), the trustee has made all payments in accordance with the confirmed plan in Mr. Edwards' case.

35. Mr. Edwards pays for his home insurance outside of escrow and has kept up on his escrow payments.

36. On July 8, 2024, Hurricane Beryl blasted through the Houston area.  A massive tree in the yard of Plaintiff Jerry Edwards fell onto his home.

37. Mr. Edwards contacted his insurance company, Texas Fair Plan Association, and they promptly sent out an adjuster.

38. The tree limbs were so large and thick that the adjuster could not get close enough to evaluate the damage to the roof.  Instead, he approved an initial payment of $6594.03 to Mr. Edwards for the purpose of having the tree cut up and hauled away, following which he would return and provide an estimate on repairs.

39. On July 20, 2024, Mr. Edwards received the first check, signed it, and sent it to Shellpoint as they were also on the check.

40. On July 30, 2024, Shellpoint sent an instructional letter to Mr. Edwards.

The letter clearly stated that if an insurance payout for damages was under $40,000, then they would not hold any of it back.  Rather, they would sign the check immediately and provide the funds to the homeowner.

41. However, Mr. Edwards did not get the funds from Shellpoint.  He contacted them and was told multiple excuses for this, including

    a)  It was because he was late;

    b)  It was because he was late on payments and so needed an inspection;

    c)  It was because they did not want him to do repairs on his own;

    d)  It was because they did not want him to do repairs on his own and thus needed estimates from contractors;

    e)  And various combinations of the above.

42. Meanwhile, Mr. Edwards did not have the funds to remove the tree from his roof!

43. On August 23, 2024, Mr. Edwards faxed the adjusters report to Shellpoint so they would have the list of necessary repairs.

44. On August 27, 2024, Mr. Edwards sent a copy of his receipt from Lowes and an explanation of how he needed the money for removal of the tree.  Shellpoint's attorney had told Mr. Edwards' attorney's office that they did not want him to do work on his own.  Mr. Edwards asked for the money to be released to him so he could hire professionals.

45. Finally, on September 5, 2024, Shellpoint determined that they would release a portion of the insurance money.  They gave Mr. Edwards $2,555.36 of the $6,594.00 insurance funds.

46. The released amount of funds was not enough to hire professionals, but he was able to pay a few people to help him with removing the branches and other tree parts on or blocking the roof.

47. Mr. Edwards' insurance adjuster came back out even though the tree was not fully removed.  He reviewed what he could, considering that sometimes damage is not visible from the outside, and sent Mr. Edwards a second check for $9,440.88 to repair the damages the adjuster could see.

48. At first, Mr. Edwards did not want to send the signed check to Shellpoint, but he needed their signature on it and they insisted that he sign first.  He sent the check initially on October 29, 2024, and it was returned for his signature, so he signed the check and sent it back to Shellpoint in December.

49. With his check in December, Mr. Edwards also sent a copy of the October 21, 2024 letter from Shellpoint that explained what he needed and checked off what he was sending (and had previously sent) and a contract with Rios Construction & Roofing, Inc for the work to be done with a price estimate of $11,411.00,

50. Shellpoint did not turn over any funds.

51. Shellpoint said they had to do an inspection because Mr. Edwards was late on payments.  Mr. Edwards and his attorney had already tried to explain to Shellpoint and their counsel that this was not true.  Mr. Edwards had made all plan payments on time and that was all that was owed, the plan payments included all the previously late amounts bundled in.

52. Despite not being late, Mr. Edwards requested that Shellpoint do the inspection.  He needed to request more than once and his attorney

also informed Shellpoint's counsel that Mr. Edwards agreed with having an inspection, please schedule one!

53. Finally, and with no communication ahead of time, on January 24, 2025, an inspector from Pat Neff & Associates appeared and did an inspection.

54. At the same time, to deal with the "Mr. Edwards is late" issue, his lawyer sent a Request for Information and Notice of Error letter to Shellpoint and it was received on January 29, 2025.

55. Shellpoint failed to acknowledge the receipt of the letter as required under CFR 1024.36(c).

56. Storms came in February, and very cold weather, but still no insurance check arrived from Shellpoint.  The home was cold and with all the rain, Mr. Edwards knew his home was getting more damaged despite the tarps he kept up.

57. Shellpoint did respond to the Notice of error letter on February 26, 2025.

58. Shellpoint's response stated that as of February 26, 2025, Mr. Edwards was past due for "September 5, 2024 through February 5, 2025, installments totaling $7,464.30, late charges of $55.00, legal fees of $1,207.63, other fees of $3,771.58, plus an escrow required amount of $105.55 minus an unapplied balance of $997.89, for a total amount due of $11,706.22."

59. The loan history statement provided with Shellpoint's response did show the two insurance checks -- $6,594.03 was deposited on 8/29/2024 as "Loss Draft Payment" and $9,440.88 was deposited on 1/24/2025 again as "Loss Draft Payment".

60. There was only the one "Loss Draft Disbursement" of $2,555.36 sent to Mr. Edwards on September 6, 2024.

61. The loan history also showed a 1/24/25 transaction of $-60.00 to Cyprexx Services for the property inspection.

62. Despite their receipt of the two insurance checks, the inspection, and Mr. Edwards three years of on-time payments with his bankruptcy, Shellpoint did not release the insurance funds until after Mr. Edwards hired a lawyer to work on his behalf, including requesting an accounting of the mortgage and filing this adversary proceeding.

63. Shellpoint is releasing the funds now, as of the last week in July, 2025.

64. Until he gets the funds, Mr. Edwards cannot repair the roof.  He has concerns as the insurance company gave him 455 days to complete all necessary repairs, including any found only after the first repairs were begun, and those days are ticking down while at the same time, the cost of materials is skyrocketing.

65. In addition, as months have passed since the initial estimates he received on the repairs and the insurance adjuster's evaluations, Mr. Edwards likely has further damage to repair due to moisture, vermin and mildews.  Since almost all his social security check goes to his Chapter 13 bankruptcy, he is concerned that the insurance checks are too late.  He has additional damages to his home to repair.

66. Also, due to tariffs and inflation, costs for the repairs will be higher and the insurance checks may not be enough to repair his home.

67. Because of Shellpoint's obstinate and reckless refusal to release the insurance funds needed to repair his home, Mr. Edwards was forced to retain his bankruptcy lawyers for this adversary proceeding so that he could get his funds and keep his home from falling further into

disrepair.

### CLAIM #1 – VIOLATION OF 11 U.S.C. 1327 AND THE COURT ORDERS CONFIRMING THE CHAPTER 13 PLAN

68.  Plaintiff incorporates the preceding paragraphs.

69. While Jerry Edwards' mortgage is not owned or serviced by Fannie Mae, Fannie Mae guidelines are followed by other loan servicers as well.  The Fannie Mae guidelines for Insured Loss Events include a section on servicer responsibilities, which includes that servicer must ensure the proof of loss claim is filed with the insurer, that it is paid out in accordance with the terms of the policy, and they must also monitor the disbursement of insurance loss proceeds.

70. The July 30, 2024 Shellpoint instructional guidelines laid out their format for dealing with the insurance and repairs and it followed Fanie Mae guidelines for damages such as happened to Jerry Edwards' home – damages that could and should be repaired.

71. The Fannie Mae guidelines list as responsibilities of the insured that the servicer disburses the insurance funds while still making sure that repairs go forward.  For mortgages that are current, any amount under $40,000 must be released immediately, and any funds above that are to be released based on periodic inspections of the progress of the repair work.

72.  The insurance checks to Mr. Edwards were under $40,000.00 and should have been released immediately as he was not late with the mortgage.

73.   Mr. Edwards' confirmed plan in the Chapter 13 bankruptcy laid out the amounts to be paid over the coming five years and the due date.  Mr. Edwards has been timely and paid each payment in full for three

years.

74. Shellpoint's accounting is erroneous as it fails to account for the fact that the plan governs the payments while Mr. Edwards is in bankruptcy.  "A confirmed plan constitutes a new arrangement between the debtor and creditors and a claim may arise from the confirmed plan."  *Blanco v. Bayview Loan Servicing LLC (In re Blanco)*, 633 B.R. 714 (Bankr. S.D. Tex. 2021).

75. By claiming that Mr. Edwards is late on his payments and that is why it is permissible for them to fail to turn over the insurance proceeds, Shellpoint is in violation of 11 U.S.C. 1327, the confirmed bankruptcy plan and the court orders confirming the plan.  "Section 1327 binds the debtor and each creditor to the provisions of a confirmed plan."  *Id.*

76. Shellpoint's failure to correctly apply Mr. Edwards timely payments, leading to their decision that he is over 30 days late and should not get his insurance proceeds immediately, is the direct cause of damages to Mr. Edwards including the likelihood of higher damage to his home, the mental anguish and physical distress of living in a home that lets in cold and damp through the entire winter, emotional distress caused by the inability to repair the home he had worked on for years despite paying almost all his funds to his bankruptcy plan, reputational damages for his home being in obvious disrepair for so long while other homes in the neighborhood get fixed, and attorneys' fees and costs.

77. Plaintiff seeks that this court order that Shellpoint make him whole and award these damages under 11 U.S.C. § 105.

### CLAIM #2 – CONVERSION

78. Plaintiff incorporates the preceding paragraphs.

79. Plaintiff Jerry Edwards sent the insurance checks to Shellpoint not as

payment, but because they had instructed him that they would then sign the checks and then provide him with the funds for the repairs. That was the purpose of the home insurance for which Mr. Edwards paid – to repair the home in case of damages.  However, Shellpoint refused to allow the funds to be used for the necessary home repairs.

80. Shellpoint made various excuses for not turning over the funds so that Mr. Edwards could repair his home – he was late on payments and so needed an inspection, he needed to provide the contractor's estimate, he needed to allow an inspection.  However, no matter how many times Mr. Edwards followed their instructions, Shellpoint kept the funds.

81. Even after the inspection, which took place in January, Shellpoint did not turn over the insurance proceeds.

82.  Mr. Edwards repeatedly requested the insurance funds so that he could repair his home.  Each time he requested, he was either ignored or provided with another thing he needed to do before the funds could be released.  However, even after following every instruction, Shellpoint kept the insurance funds.

83. Shellpoint has not responded to Mr. Edwards' emails where he asks why they are not providing his funds.  They no longer have any reasons – because there are no reasons – and yet they hold the funds.

84.  The funds being held are not inspecific – they are the insurance funds which under servicer guidelines are to be held in a separate, interest-bearing account until provided to the homeowner for repair of the damages covered by the insurance policy.

85. Because they exercised wrongful dominion and control over the insurance funds which rightfully belonged to Mr. Edwards, and they

continued to hold them despite his repeated requests for their release, Shellpoint is liable for conversion.

86. As a result of their conversion, Mr. Edwards has suffered not only the loss of the funds but also the loss of use and the increased cost of construction materials and labor as well as the increased deterioration of his home which would have been avoided had the conversion not taken place.

**PRAYER**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants as follows:

    (a) For an immediate turn-over of the insurance funds;

    (b) For actual damages, including economic harm and mental anguish;

    (c) For an award of attorneys' fees, costs and expenses incurred in the investigation, filing and prosecution of this action;

    (d) For such other or further relief as the Court deems proper.

Respectfully submitted,

Amy Beth Clark, TX Bar No. 24043761
Ciment Law Firm, PLLC
221 Bella Katy, Dr.
Katy, Texas 77494
Ph: 833-663-3289
eService: courtfilings@cimentlawfirm.com
ATTORNEY FOR DEBTOR and PLAINTIFF
Jerry Edwards Sr.